So, Mr. Rosenberg, you have reserved two minutes for rebuttal, so that gives you eight minutes out of the gate. Are you ready? Okay. You may proceed. Your Honors, may it please the Court, I represent Dr. Purification Cristobal and I'm Jonathan The District Court found that approximately one-third by a speculative estimate of oxycodone prescriptions prescribed by Dr. Cristobal during the time period alleged in the case for distribution and possession of oxycodone, three counts she was convicted of at trial, Ms. Dr. Cristobal, found that approximately one-third of those prescriptions, whatever number that would be, was the reason to give her, in part, approximately seven years in prison. And we believe that sentence was substantively and procedurally unreasonable. The jury's decision to convict this doctor of distribution and possession of narcotics on three of the counts, specifically oxycodone only, hinges on the finding. And we're not sure if they had the full finding as to intentional unauthorized practice of medicine within the scope of what the standard practice of medicine would be. But the jury's finding hinged on ultimately what two experts said, the professional standard of practice, or was the scope of the standard of practice of medicine. Why do you say that though? I mean, did there were testimony from the receptionist and others about what exactly the waiting room looked like and warnings about the bulk or large number of the people she was prescribing to being addicts? That didn't turn on an expert. Because the jury's request for comparing the transcripts of both experts showed us that the jury relied very heavily on that testimony, and we know that one of the experts couldn't testify or be cross-examined fully, as of the evidence in the case, because nearly a hundred pages of documents were not turned over until the middle of trial relating to that expert, the government's expert's testimony. As the Court's aware, the expert for the government testified that New York law required physical examination before the prescription of oxycodone. This was permitted to be testified to. It's a legal conclusion from an expert. Whereas the expert for the defense said her practice was not outside the scope, ultimately in sum and substance. The jury was... I'm trying to figure out, I mean, you alluded to just now the late document production, and that prevented an effective cross-examination, but I guess that's not clear to me from your brief. I mean, there's no dispute that there was a disclosure made mid-trial, but it's unclear to me what prejudice was the result of that. So what are you referring to when you say you couldn't effectively cross-examine? Well, I was not the trial lawyer, but... No, I mean, you're fine. Of course. Dr. Garibald for the government testified in sum and substance there was essentially no documentation to back up any type of treatment for any type of diagnosis, as did Dr. Christobal. He stated that during his testimony. He made statements after the conclusions of what the practice of medicine under New York law mean. But the trial attorney later found out for the defense there were missing MRI records, missing scans having to do with patient records, that perhaps we'll never know unless it's a new trial, could have involved physical examinations, could have involved proper information. Wait, when you say later found out, what do you mean later found out? You mean during the trial? During the trial, about three days in, two days the government came up with a new production and about three days in the defense counsel said, hey, there's even more missing. And the government said, hey, it's unintentional, but yeah, we're still investigating documents, we're still looking at some things. And the district court said, well, you better turn it over. And they eventually turned over, who knows? We think they turned over everything at that point. We don't know. But not after trial, during trial, right? It was during trial. Was there any request to reopen a witness or recall a witness based on the later produced documents? There was a request in the Rule 33 motion, and that's why it's an abuse of discretion standard. No, I mean, but you don't get to do that after the trial, you get to recall witnesses during a trial. But was there any request made to recall the witness after the disclosure of these documents? I don't recall the request from my recollection a week and a half ago. I didn't see it, that's why I asked. I was re-reading the transcript a week and a half ago. But they did make it very clear to the court that this prejudiced the defendant, because missing one- Well, you don't get to just say it prejudiced me, you have to generally show why it prejudiced you. So what was the defense lawyer prevented from doing on cross-examination or on a recall? Right, Judge. On a recall or even cross-examining the witness, if you don't have all the documents available, we don't know- So what kind of cross would an effective lawyer have done now that you know the documents? The argument the government makes, which we would dispute in trial, would be there were no physical examinations and her practice fell outside the scope of authorized practice of medicine. We also know that it needs to be intentional, falling outside the scope based on Ruan, the recent case- Right, but these are, those are the things you have to show. You have to show the intent and you have to show that it was not, it fell outside the scope of authorized practice. But I'm asking what things would you have cross-examined the witness on based on this late produced information? Well, as we say in our brief, we're not even sure that we got everything in the production. So it's very hard to know what we could have cross-examined on without having had all the medical records- That sounds like speculation. You don't, you never know if you get everything from the other side. But some of this stuff is your client's own files, right? Well, there were summary charts, for example, that were used by the prosecution in saying that- The summary charts are based upon your client's own files, right? Some of it was based on our client's own files. We don't know, again, what completely was missing because it's unclear to us, for example, if we got all the, even the prosecution- You could litigate here whether you got everything, and that usually is done in the district court. Sure, and that's why the Rule 33 motion raised this issue very broadly and very intently. It was a big deal. I can't go back, obviously, for the trial counsel and correct what we call a Brady violation. But overall, the government has the permission in the course of their investigations of these cases to deceive. Federal agents can walk into her clinic and pretend to be other people. In this case, one federal agent walked in, pretended to be a patient, gave over a fake information, gave over a fake MRI that had nothing to do with that individual. They're able to deceive for the purpose of uncovering criminal activity. Brogan in 1998 found that they could do that. Brady's an exception to the government's right to mislead, lie, or make these mistakes in giving the defense the full opportunity to cross-examine and investigate information. If we don't enforce Brady violations that are even without preservation by trial counsel, we have nothing to rely on in a case. It's the only exception, really, to the government's ability in the course of an investigation. You have to show some prejudice with the Brady violation, right? So you're basically saying we'll never know if we could have done a more effective cross-examination, but that's not going to cut it. So I guess I'm just trying to figure out, is there something you can point to that would have altered the cross, would have altered the evidence before the jury? I think had the defense team been able to look at all of the files and all of the scans, they could have had a better cross-examination of the expert as to whether physical examinations occurred, as to whether they were thorough examinations. I believe it was only, what, every 20th patient file that the expert, or that, excuse me, the agent, DEA agent testified to reviewing in this case in the first place. They didn't even review all the evidence themselves they admitted in the trial. I understand it was voluminous, but for the court to then later say it's sentencing, what we're going to assume on speculation, by the way, one-third of this is illegal oxycodone prescriptions, and that's what we're going to base our sentencing on in part, is a pretty remarkable outcome for a 75-year-old lady without any history of criminality. The government must be, at the end of the day, if the government admits they didn't turn over, important patient files that relate to an expert's testimony, and we still don't know what kinds of information may not have been turned over, a new trial is warranted, Your Honor. What's the law for that? I'm trying to figure that out. So the government has a late production. You can't say whether it's harmful or not. You're saying you don't know, but that nonetheless requires a new trial. Correct, and the law for that is, for example, United States VGIL, which says, in essence, finding disclosure of exculpatory material on the eve of trial even constitutes a Brady violation. We know from, that's a Second Circuit case. We also know from Kyle's v. Whitley, a United States Supreme Court case from 1995, that suppressed evidence collectively, if looked at on the whole, right, brutality. If it would prejudice the defendant. Well, but that's the whole point. How did it prejudice the defendant? Well, the investigation. The evidence disclosed, the evidence has to result in prejudice. So what is the prejudice here? What would you have done differently, if you were the trial lawyer, had you had this information? Had I had this information, we would have cross-examined on the scope of practice, based on whatever information we did not receive. But because we couldn't investigate it, I wasn't the trial lawyer, but because the trial lawyer could not investigate it, that's the prejudice. The purpose is to give the trial lawyer time to investigate these documents. We can't investigate it on appeal. We can't investigate it after the judgment or sentencing. And that's ultimately the problem. Otherwise it goes to a 2255. What is the lead? What is the lead that would have supported a line of investigation that could have raised a question as to the guilt of your client? What is the lead in that? Now, the government agreed that it wouldn't use any of those documents, and then it wouldn't object to your using them or your client using them. But what is the lead that would have justified further investigation? Well, perhaps the defense expert, right? This is not speculative. Had they been able to look at these documents that were not disclosed timely, had they been able to investigate and look at it, the defense expert might have testified differently in favor of the defendant. It might have been able to pinpoint specific documents showing physical examinations. The government uses these very strong no words. No physical examination ever occurred. She never looked at a patient ever before prescribing oxycodone. Your client would know if she had a practice of examining patients and would have had her files. It's hard to say she's deprived of her files when she had all of them and could have gone to them and had her lawyer or herself gone through them and said, here's one, I did a physical examination. Actually, here's a score of them in which I did the physical. Or she had all those documents. I don't think she had her files, Your Honor, because they were seized by the federal agents. And I think that's, yeah. But they were available to your client, right? I mean, your client could have reviewed them, the hard copies, right? The ones that were turned over by the government. I never asked her directly if she could have reviewed them, you know, during the course of trial except what was turned over in discovery. I never asked her if she had her own, you know, that was not a question that came up. But I'm assuming if the government seizes documents, or if she can't physically have those documents that the government then scans later, they seize them as part of the arrest in this case. So what is she supposed to do at that point? I mean, once the person's arrested, all bets are off except what we rely on from the government. It is their affirmative duty. And we know that it could not have been investigated. Missing one document in a case is like missing the entire case, we learn in exonerations. Missing one is like not having all the discovery. Missing over 74 is terrifying. She's sitting in for nearly seven years, first offense for this pill mill, they call it. They call it a pill mill. Yet she did see the patients. One patient, I guess, came in and she was 75 years old and said, they're coming on behalf of somebody else. Whether that's unauthorized practice of medicine or outside the scope, I think the jury would have liked to have heard what the patient records had all stated or said. I think the expert for the defense could have testified to those records with further investigation. The prejudice is that we can't know without further investigation. That's the prejudice. I wish I could answer the question here. I can't give the direct answer because we can't know. You can know. I understand this. I mean, that happens all the time. A document is produced. You say that we didn't have time to do anything with it, but now it's clear that we would have done something. You could have done that in your Rule 33. You could have presented that to the court before the sentencing. So, I mean, the fact that to this day you can't really say what the cross would have looked like does make this seem highly speculative. And Brady does require prejudice, right? You concede that. I certainly concede that, Your Honor. I think that's where the totality or the whole of the deprivation of discovery does the finding. As to the totality of the circumstances here, there's no question in my mind that the defendant was deprived of their ability to investigate. Did the lawyer preserve it properly? Probably not. But is preservation necessary? Probably not. I would ask the court to look closely at the briefs and see if further investigation, in their view, would have changed the case. In our view, there's no question it would have changed the case based on how the jury fumbled and asked questions over what it meant, the scope of practice, what it meant, what the two experts had been talking about. These two experts said very different things, and it's remarkable. A doctor, not a medical doctor, but a person who practices medicine, sent to prison because they sent in an undercover and they gathered evidence saying she overprescribed oxycodone. Her receptionists both testified, right? Her receptionists testified, got a deal, of course. But they were there, so this is not relying on an expert's review of documents. This is, you know, I mean, basically that testimony was pretty powerful, it would seem, from reading the transcripts. I think the jury, of course, had the right to draw their conclusions on that. I think the jury notes show that where they really were hung up was on the experts and as to the meaning of scope of practice. There were about three terms used in the jury instructions, and if I recall, the district court instructed over the objection of defense on the jury instructions, and I'm not using the exact word, but they all kind of mean the same, right, these three scope words. It's a very confusing instruction for a jury. Well, you've got two minutes for rebuttal, so we've gone over, but that's okay, you'll keep the two. Thank you, Your Honor. Thank you, Mr. Rosenberg. We'll now hear from Mr. Wickstrom for the government. Okay, you may proceed. Thank you, Your Honor. May it please the Court, Derek Wickstrom for the United States. I also represented the government in the district court. I want to pick up on the Brady claim that Mr. Rosenberg spent most of his time on. He says we can't know what the defense might have been able to investigate, but that's just not correct. I'm sorry, could you speak a little more informally? Oh, certainly. Sorry, Your Honor. Thank you. So Mr. Rosenberg says we still don't know what these documents could have been used for, but we do. He says that the defense expert didn't have an opportunity to testify about the missing pages from the patient files, but she did because the defense had all of those records at the time of her testimony, before her testimony. More to the point, as Judge Fela found, the record site for this is docket 195. It's a transcript at page 18. Judge Fela found that these boxes of paper files that were seized from Christobal's clinic were available for defense inspection for more than a year before the trial date. The defense, in fact, inspected the boxes. That is all that was required. The government, nevertheless, endeavored to make sure that full electronic scans were provided. Human error resulted in missing pages from some of those patient files, and the government, upon realizing that, promptly corrected it. So the paper files were the originals, or the paper files were themselves photocopies? They were the originals, Your Honor. They were the originals. Yes. And there weren't photocopies other than the electronic versions that were sent to defend them? That's correct, Your Honor. Now, Mr. Rosenberg asks what was the defense supposed to do to investigate this, but the answer was what they did. The answer was to inspect the paper files. The answer was to provide the full electronic files that had been provided to their expert. Or, I guess, ask for a continuance, ask for a general time to review things. Certainly. The defense could have asked for that but did not, and the reason they didn't is because they didn't need it. Their expert had these files. Now, I want to note also, Mr. Rosenberg mentioned that cross-examination of Dr. Garibo, the government's expert, was somehow impeded by the lack of these documents. But it's noted in the record at, forgive me, I believe it's transcript page 804 and 805, that the government explained that Dr. Garibo was going to be given the missing pages from the patient files that he had reviewed in order to facilitate any defense cross-examination as to those pages. So he did receive them. There was no reason why his cross-examination was impeded, and there's no basis in the record to conclude that cross-examination of Dr. Garibo was impeded by this issue. The defense had these files. Mr. Rosenberg himself has been on this case since 2022. The defense had these files in full electronic copies no later than August of 2022, and he suggests that somehow there might have been some missing page that suggested that Christobal ever conducted a physical examination, but she never did. There was testimony about that at trial, and in all these months, Mr. Rosenberg has had full access to the files. He hasn't found a piece of paper that shows that. If he did, I presume he would be waving it around. So there's simply no prejudice here. There was no suppression. There is no basis to disturb Judge Fala's rejection of this Brady claim in the Rule 33 motion. I want to address also Mr. Rosenberg's challenges to the reasonableness of the sentence. He said at the beginning of the argument that the sentence was both substantively and procedurally unreasonable, but there was no substantive unreasonableness claim in the briefs. That claim is waived. As for the procedural unreasonableness, this court can affirm on any basis in the record, and the record here supports the finding that probation made and that the government sought that all or substantially all of Christobal's oxycodone prescriptions were unlawful. Judge Fala's conclusion that only 33 percent of them were unlawful was an effort to be what she described as generous to the defense, but it was- She didn't find that two-thirds of them were valid. She did not find that. She just sought to make as generous a finding, as conservative a finding as she could, in order to favor Christobal. Well, I mean, one of the cooperating co-conspirators, the pharmacist, O'Hara, said that a majority of the patients were selling drugs. That's right, Your Honor. Based on the prescriptions that she wrote. That's correct. I believe that's in Government Exhibit 460, and he told her that early in the conspiracy, in 2019, she didn't change her behavior except to complain that she was worried that that pharmacist was wearing a wire. But beyond that, even if there were some procedural error, and again, if there's an error here, it's an error in the defendant's favor, but even if there were a procedural error, the record here makes absolutely clear that Judge Fala was not at all tethered to these or any other guidelines, and she would have imposed the same sentence even if the guidelines had been lower. I do want to note Mr. Rosenberg's brief argues that we need to make a patient-by-patient showing. As noted in footnote 11 of our brief, if a mere 3% of the prescriptions had been unlawful in this case, the guidelines would have been well higher than the sentence that Judge Fala ultimately imposed, and there was lots of patient-specific evidence that would permit a finding of that 3%. So here are a couple of examples. If only counting oxycodone prescriptions to Christobal's own co-conspirators, just the prescriptions to employees that were listed in Government Exhibit 1556 and the prescriptions to the drug dealer Justin Campanello that are listed in Government Exhibit 1557, those prescriptions combined would be a little more than 3% of the total. Or another way, Dr. Garibo testified as examples about four patients whose prescriptions are contained in Government Exhibits 1510 through 1513. If you add up just the prescriptions in those four exhibits, it would be a little more than 3% of Christobal's total oxycodone prescriptions. So my point isn't to say that the court should go patient file by patient file here. We don't need to do that. My point is to say that even if there was a procedural error here, it is clearly harmless on this record. Unless the court has any questions about those or any of the other issues in our brief, the government will otherwise rest on its briefs. All right. Thank you very much. Thank you. Mr. Wigstrom, Mr. Rosenberg, you've got two minutes of rebuttal. Go ahead. Your Honor, I'll just say that it's not my job to review all discovery on appeal to determine what the cross-examination would have been, as the government's implying here. Well, I think it is your job to articulate why there's prejudice from a late disclosure. It's my – You don't get to stick it up and say, well, we'll never know. But there may be something. I didn't hire an expert to look at discovery. What I can say is this. The defense was not given enough time to investigate or even compare the scans. And that is a remarkable, at the very least, negligence on the part of the government in their prosecution of this case. Well, it might be negligence. It's just not Brady. It's not a Brady violation unless it caused some prejudice. So you can't say, having looked at whatever these 74 pages were, that there's anything in there that prejudiced your client. Your Honor, I appreciate the court's questions. Are there any further questions regarding the brief before I rest on my briefs? No, no. It's your rebuttal, so I think you want to say it. Okay. If nothing else, I would ask, well, one more thing, to look at Ruan's case. His intent is very important here as to departing from the standards of medical practice. It's a standard that a medical professional must intentionally depart from the standards of medical practice. We do not believe that is shown, and we rest on our briefs and the record in making that argument. Okay. Thank you, Mr. Rosenberg. Mr. Wickstrom, we will reserve decision. Have a nice weekend.